**IN THE UNITED STATES DISTRICT COURT**

**DISRTICT OF COLORADO**

**Civil Action No. 25-CV-**

**EARNEST MOSMAN, SEAN McCLUTCHEY, and CHRISTOPHER ROBINSON**

**Plaintiffs**

**v.**

**DENVER THEATRICAL STAGE, FILM, AND EXHIBITION EMPLOYEES' UNION, LOCAL 7**

**Defendant.**

---

**COMPLAINT AND JURY DEMAND**

---

Plaintiffs Ernest Mosman ("Mosman"), Sean McClutchey ("McClutchey") and Christopher Robinson ("Robinson") for their Complaint and Jury Demand states as follows:

**JURISDICTION AND VENUE**

1. This action is authorized and the jurisdiction of this Court is invoked pursuant to 29 U.S.C. section 412.
2. Venue is proper in this Court as the unlawful employment actions alleged herein were committed within jurisdiction of the United States District Court for the District of Colorado.

**NATURE OF ACTION**

3. This is an action initiated under 29 U.S.C. §411 for violation of the Plaintiffs' rights under the Union Members' Bill of Rights.

4. The Plaintiffs collectively assert that the Defendant has systematically violated their rights to equal rights and privileges, freedom of speech and assembly, and safeguards against improper disciplinary action, as set forth below.

## PARTIES

5. Plaintiff Mosman is a member of the Defendant Union and is a resident of Colorado.
6. Plaintiff McClutchey is a member of the Defendant Union and, at all time relevant hereto, a resident of Colorado.
7. Plaintiff Robinson has been a member of the Defendant Union and a resident of Colorado.,
8. Defendant Union is the local affiliate of the International Alliance of Theatrical Stage Employees, Moving Picture Technicians, Artists and Allied Crafts of the United States ("Union").

## FACTUAL ALLEGATIONS

### ERNEST MOSMAN

9. There was an email to the Union which alleged that the Union President at the time, Joe Anderson took a bribe to allow someone to leave a function early.
10. Mosman was leaving a meeting with other Union Members who stated that Wilton Preston was having trouble with Anderson, however, Mosman did not, at any time, participate in that conversation.
11. In a prior misconduct claim against Member Doc Manny for sexual harassment, Max Peterson, the Union Business Agent sent an email to Members stating that Mosman had seen the harassment by Manny.
12. At the next Union meeting, Mosman exercised his right to freedom of speech pursuant to the Union Member's Bill of Rights, when he stood up and said Peterson's email was a lie and that he had never seen such conduct by Manny.
13. On April 1, 2024, Mosman challenged the suspension of Sheehan for alleged sexual harassment.

14. The victim of the alleged harassment, Jocelyn Baysinger, contacted Mosman to inform him that no sexual harassment of any kind had occurred.
15. Baysinger also informed Mosman that Max Peterson had been pressuring her into writing a letter saying that Sheehan had sexually harassed her.
16. When she resisted Peterson's pressure and informed him that no such harassment had occurred, Peterson stated that, if she did not write the letter he requested, she would receive no work from the Union.
17. Mosman suggested that Baysinger and Sheehan write statements and have them notarized.
18. The letters were notarized by Mosman's son.
19. The following day, Mosman was in a hiring hall committee meeting when Sheehan entered and Peterson read the charges to him, which Sheehan denied and presented the notarized letters from the day before.
20. When Peterson and Bryant Preston read the letters and saw Mosman's son's signature, they ordered him to leave the room and stated that he was no longer a member of the hiring committee.
21. One month later, Mosman received a Notice of Infraction for "Detrimental Conduct" and a suspension, informing him that he could appeal the findings.
22. Mosman was not informed of the specifics of the conduct he had allegedly been engaged in or the witnesses who would testify against him, until the date of the hearing.
23. The hearing was held on August 25, 2024, when Mosman finally discovered that the charge was based upon the allegation that he "didn't share information with the Committee" regarding the letter written by Baysinger.
24. Other witnesses, seeing what happened to Baysinger, were scared and intimidated into not offering testimony in support of Mosman.
25. Prior to the appeal hearing, Mosman was denied discovery, including the identity of the witnesses and documents to be used against Mosman.

26. During the hearing, Mosman's Union representative was denied the ability to cross-examine witnesses supporting the chage.
27. Mosman's appeal was denied without any recitation of factual findings upon which the denial was based, and as a result, Mosman was suspended for 3 months and fined $3,000 but was never told what the fine was related to.
28. In September 2025, Mosman was presented with a Notice of Infraction and Incident Report alleging that he had engaged in the "Detrimental Conduct" of "harassment or intimidation", without specifying the conduct which was the basis for the claim.
29. Mosman also requested discovery to defend himself from the allegations, but the request was denied by the Union.
30. Mosman appealed the Notice of Infraction and requested, prior to the hearing, that the accuser be identified, but was denied and told that, pursuant to Union policy, the accused was not told the identity of the accuser.
31. An appeal hearing on the detrimental conduct charge was held in November 2025, at which time, Mosman was finally told that the conduct he was alleged to have engaged in was talking about Anderson taking bribes.
32. Mosman was also notified at the hearing that an alternate reason for the detrimental conduct claim was the allegation that he was preventing Bryant Preston's cousin from obtaining work through the Union.
33. The only witness who testified against Mosman in the November hearing was Wilton Preston, the brother of the then President of the Union, Bryant Preston.
34. It is Union policy that members are required to bring evidence to defend themselves against charges without knowing the accuser's identity or the allegations which form the basis of the charge.
35. When Mosman requested a continuance to gather information and witnesses for his defense, he was denied the continuance and was told that the hearing at which he discovered the nature of the claims against his was his "only opportunity to present evidence".

36. Mosman was also denied access to video evidence pertaining to the incident, which would have cleared him of the charges made against him.
37. In December 2025, Mosman's appeal was denied without any factual findings, and he was suspended by the Union for 12 months on the first charge and 3 months on the second charge for a total of 15 months.
38. The claims were clearly fabricated as retaliation against Mosman for his actions calling out Peterson at a Union meeting, for the lies he sent to Union members about Mosman.
39. The Union By-Laws and the Union Bill of Rights require due process, which was denied in all of Mosman's appeals.
40. The Union also retaliated against Mosman for exercising his rights as a Union member, in violation of the Union Bill of Rights.
41. The Charges were subsequently broadcast by email to the industry harming future employment opportunities, which was a deviation from prior Union practice.

**SEAN McCLUTCHEY**

42. In reaction to McClutchey's willingness to testify on behalf of Mosman, McClutchey was subjected to fabricated charges alleging breach of Union rules.
43. McClutchey received an Incident Report which alleged that he had engaged in "Detrimental Conduct, including "harassment and intimidation" but the charges contained no specific conduct and were too vague to allow a proper defense.
44. When McClutchy requested clarification of the charges, his request was denied.
45. McClutchy subsequently received A Notice of Infraction for the fabricated offense, and he received a 6 month suspension on October 30, 2025.
46. An appeal hearing regarding the charges was held on December 2, 2025 during which emails that were presented as evidence were misinterpreted.
47. Although McClutchey was allowed to present witnesses in his defense, Mosman was unable to testify because he had to leave and the Union went ahead with the hearing instead of adjourning until the witness was available.

48. When council for McClutchey attempted to cross-examine witnesses, Max Peterson, the Union representative at the hearing, objected to the questions and Bryant Preston, the Union official presiding at the hearing upheld the objections.
49. Upon information and belief, witnesses whose testimony would have supported McClutchey's defense of the claims were intimidated by the Union with implied and understood threats to refuse to call those witnesses for referrals to work.
50. The economic threats against the witnesses caused them to refuse to testify on McClutchey's behalf.
51. McClutchey's appeal was denied without factual findings.
52. The Charges were subsequently broadcast by email to the industry, harming future employment opportunities, which was a deviation from prior Union practice.

**CHRISTOPHER ROBINSON**

53. Wilton Preston, the brother of then President Bryant Preston was placed in a position of Job Steward and Lead, despite the serious lack of qualifications and an extensive, documented history of harassment and retaliation.
54. Throughout 2025, Robinson had numerous confrontational encounters with Wilton Preston including verbal assaults, harassment and retaliation.
55. Robinson similarly experienced recurrent harassment and retaliation perpetrated by Steward Kevin Lengyel that intensified through 2025 with the abuse of his position of authority denying Robinson's seniority and eligible work that Robinson attempted to report to employers escalating to further retaliation.
56. Robinson attempted numerous times to have Wilton Preston's and other's aggressive behavior addressed by the Union, but nothing was ever done to curb his aggression against Robinson.
57. Robinson received a Notice of Possible Infraction for allegedly working on personal papers while working on the job on August 8, 2025, but the Notice did not contain the details of when this allegedly occurred or who witnessed the action.
58. The Notice provided Robinson with the option of either accepting a suspension or appealing, without disclosing the relevant information of the infraction.

59. Robinson also received an Incident Report that did not provide any substantive information other than the allegation.
60. After reporting Wilton Preston's and other's harassment and retaliation, on January 15, 2026, Robinson received another Notice of Infraction alleging that he had been sleeping on the job on January 10, 2026.
61. The Notice failed to provide the substantive information of the offense as Robinson was never informed of the accusers making the claim, denying him the ability to thoroughly refute the allegations.
62. On January 11, 2026, the situation with Preston escalated when Robinson was physically assaulted by Preston, while working at the Colorado Convention Center.
63. At or near the date of the assault, Robinson informed the Union of Preston's assault.
64. Robinson filed a charge of assault with the Denver Police Department on January 25, 2026 against Wilton Preston and informed the Union of the offense.
65. On January 19, 2026, Robinson was presented with another Notice of Infraction in which he was alleged to have violated Union rules regarding "detrimental conduct" on January 16, 2026 alleging that he had made the statement that Wilton Preston was "retarded".
66. The infraction alleged that there were two individuals who were spoken to by the Union, and statements had been requested.
67. When Robinson sought the identity of the alleged witnesses and a copy of the statements, the Union did not reply.
68. The Notice of Infraction again never informed Robinson of the identity of the Union members who made the accusations against him.
69. Robinson never received the documentation upon which the offense was based, denying Robinson any meaningful opportunity to refute their contents.
70. Robinson filed a written appeal of the infraction, but without the identity of the accusers or documentation of the offense, his appeal was ineffective.

71. On April 4, 2026, the appeal was denied by the Union without any recitation of the facts upon which the denial was based and Robinson was suspended for a week for the allegation of sleeping on the job.
72. Upon information and belief, the Union's policy is that accusers who alleged violation of Union policies were never identified to Members subject to disciplinary actions, denying them the basic right to cross-examine the accusers.
73. On May 1, 2026, Robinson's appeal regarding calling Preston retarded, was summarily denied without any citation of facts or witnesses and he was suspended four (4) weeks for the alleged infraction.
74. On April 4, 2026, Robinson received a Notice of Infraction alleging that he had been a No Call/No Show.
75. Robinson appealed and presented evidence that he was present at the event in question, but on July 29, 2026, his appeal was summarily denied.
76. He was never given any evidence upon which the infraction was based.
77. Robinson's appeal was again summarily denied, and he received a one-week suspension for the No Call/ No Show infraction.
78. On April 8, 2026, Robinson received a Notice of Infraction for a Walk on Violation alleging that on April 5, 2026 he had accepted a job assignment directly from an employer instead of going through the Union.
79. Robinson's appeal alleged that he did not engage in the conduct cited and the employer presented a statement on his behalf.
80. On February 26, 2026 Robinson received another Notice of Infraction alleging harassment and intimidation on February 24, 2026
81. The Notice only stated that the offense was based on text messages and made at "various" employers, without identifying the actual text message or employer.
82. Robinson made multiple attempts to obtain additional information through phone calls and emails which were never responded to and which prevented Robinson from file an appropriate appeal.

83. Robinson's appeal was again summarily denied and he was suspended six (6) months for that infraction.
84. The multiple disciplinary actions within a short period of time were clearly in retaliation by the Union for bringing forth allegations of harassment, intimidation and retaliation against the Union President's brother and Lengyl.
85. Although he appealed each of the infractions noted above, when they were each denied, he was never informed of the information upon which the Union based the denial of his appeal.

**FIRST CAUSE OF ACTION**

86. Plaintiffs incorporate by reference all factual allegations set forth above.
87. Plaintiffs' Union Member rights are protected by the Union Members's Bill of Rights 29 U.S.C. section 411.
89. Pursuant to that protection, Union Members have equal rights and privileges to nominate candidates, vote, attend union meetings and participate in deliberations.
90. The Unions Member's Bill of Rights also protects freedom of speech to criticize Union leadership and prevents the Union's attempts to silence dissent.
91. The Bill of Rights also protects Union members against improper discipline and prevents members from being fined, suspended, expelled or otherwise disciplined for exercising their rights under the LMRDA.
92. If a charge is filed internally, a Member must be provided with written specific charges, time to prepare a defense, a fair hearing, and the right to confront witnesses.
93. Pursuant to 29 U.S.C. section 411(a)(4) Union Members may bring a private cause of action to enforce the rights protected thereby.

94. The Plaintiffs have each exhausted their internal remedies for these violations.

95. The Union has violated the Bill of Rights in multiple ways, including using the disciplinary process to retaliate against Union members.

96. The Union has also violated the Bill of Rights by using Notice of Infractions which do not provide specific information about the charges, do not provide time to prepare a defense based upon specific charges and refuses to identify accusers denying Members to right to confront those witnesses.

97. The Plaintiffs have suffered damages as a result of the Union's multiple violations of their protected rights as Members of the Union.

98. Other Members of the Union continue to suffer as a result of the Union's refusal to protect and provide the basic protected rights in the disciplinary process.

**WHEREFORE,** the Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendant Union and award the all relief as allowed by law, including but not limited to, the following:

a. Injunctive relief requiring Union to protect Union Members' rights and provide due process in disciplinary proceedings, including providing specific charges, providing Members with discovery, allow continuances in order to obtain witness testimony and the identification of accusers;

b. Injunctive relief preventing further retaliation against Plaintiffs;

c. Revoking and voiding suspensions currently being served by Plaintiffs and reinstatement to referral rights;

d. Monetary relief to Plaintiffs for lost wages and benefits during the period of suspensions;

e. Declaratory judgment declaring the Union's procedures to be unlawful; and

e. Award attorney's fees and costs.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

**DATED** this 26th day of August 2026.

**SCOTT F. REESE, P.C.**

**S/ Scott F. Reese**

Scott F. Reese
795 W. Birch Ct., Suite 100
Louisville, CO 80027
(303) 665-4448
**Attorney for Plaintiff**